## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| TRICIA VINEYARD, individually, and on behalf of all similarly situated persons, | |
| Plaintiff, | |
| v. | No. 3:24-cv-00704-NJR |
| LA TERRA FINA USA, LLC, | |
| Defendant. | |

### FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff, Tricia Vineyard, individually and on behalf of all similarly situated current Illinois citizens, alleges the following facts and claims upon personal knowledge, investigation of counsel, and information and belief.

### NATURE OF THE CASE

1.    This case arises out of deceptive, unfair, and false merchandising practices of La Terra Fina USA, LLC's ("Defendant") with respect to its "la terra fina" brand Dips that it sells in several varieties: Artichoke & Jalapeño Dip & Spread, Cheesy Artichoke Dip & Spread, Chili Con Queso Dip, Everything But The Bagel Dip & Spread, Greek Yogurt Spinach & Parmesan Dip & Spread, Greek Yogurt Spinach Artichoke & Parmesan Dip & Spread, Green Chile & Cheese Dip & Spread, Mexicali Dip & Spread, Spinach Artichoke & Parmesan Dip & Spread and Sriracha Three Cheese Dip & Spread (the "Dips").

2.    On the label of the Dips, Defendant prominently represents that the Dips have "NO ARTIFICIAL FLAVORS, COLORS OR PRESERVATIVES" (hereafter shortened to "No Artificial Preservatives") which leads consumers to believe that the Dips have no artificial preservatives.

3.      Defendant's "No Artificial Preservatives" representation is false, deceptive, and misleading because citric acid acts as a preservative in foods and beverages, and the citric acid used in prepackaged consumer foods (including Defendant's Dips) is mass-produced through a commercial, microbial/chemical manufacturing process. The synthetic citric acid Defendant uses in its Dips comes in the form of a white powder that does not occur in nature. And it is made in an industrial process that begins with a fermentation phase using strains of the mold *Aspergillus niger* and is then chemically converted to a citrate salt, after which the salt is transformed into an acid using reagents like sulfuric acid before it is finally reduced to its artificial, crystalline, white powder form.

4.      Ninety-nine percent of the global production of citric acid is manufactured through fermentation processes like the most common one just described. The final product is sold as an anhydrous or monohydrate acid, and about 70% of total global production is used in food and beverage industry as an additive. In addition, global demand for citric acid is high, manufactured citric acid is far cheaper than citric acid extracted from citrus fruits, and for these reasons, the vast majority of citric acid used in food and beverages is manufactured.

5.      For these reasons, it is highly probable—and certainly more likely than not, which is the ultimate the burden of proof in this civil matter—that Defendant uses manufactured citric acid in its Dips, like virtually all food manufacturers on the planet who use citric acid.

6.      Defendant's "No Artificial Preservatives" representation is thus false, deceptive, and misleading because Defendant adds industrially manufactured, synthetic citric acid powder to the Dips that is both artificial and a preservative.

7.      Defendant's representation that the Dips have "No Artificial Preservatives" is deceptive or misleading to a reasonable consumer because they contain manufactured citric acid.

Plaintiff and Class Members paid a premium for the Dips over comparable products that did not purport to be free of artificial preservatives. Given that Plaintiff and Class Members paid a premium for the Dips based on Defendant's misrepresentations that they contain "No Artificial Preservatives," Plaintiff and Class Members suffered an injury in the amount of the premium paid.

8.    Plaintiff brings this case to recover damages for Defendant's false, deceptive, unfair, and misleading marketing and advertising in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 et seq. and Illinois common law and bases the claims of class members from other states and territories on their states' and territories' respective consumer protection statutes and under the common law or case law of those states.

## PARTIES

9.    Plaintiff, Tricia Vineyard, is an Illinois citizen residing in St. Clair County, Illinois. On at least one occasion during the Class Period (as defined below), Plaintiff purchased Defendant's Everything But The Bagel Dip & Spread at Schnucks in Swansea, Illinois, for personal purposes after reviewing the label and the "No Artificial Preservatives" representations. Plaintiff paid $3.99 per package. If Plaintiff had known the Dips contained artificial preservatives, then she would not have purchased them or would have paid less for them. Plaintiff's claims are typical of all class members in this regard.

10.    Defendant, La Terra Fina USA, LLC, is a Delaware limited liability company with its principal place of business in Union City, California.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332. Subject matter jurisdiction because the amount in controversy exceeds $5,000,000, exclusive of costs and a substantial number of members of the proposed class are citizens of states other than Illinois.

12.     Defendant is a Delaware limited liability company with its principal place of business in Union City, California.

13.     This Court has personal jurisdiction over Defendant because Defendant has more than minimum contacts with the State of Illinois and has purposefully availed itself of the privilege of conducting business in this state. In addition, as explained below, Defendant committed affirmative tortious acts within the State of Illinois that gives rise to civil liability, including distributing the Dips for sale throughout the State of Illinois and the United States.

14.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTUAL BACKGROUND

15.     Defendant produces, markets and sells the Dips throughout the United States including this district.

16.     Knowing that consumers like Plaintiff increasingly desire to purchase and consume healthy, wholesome ingredients and avoid highly processed foods and chemical additives, Defendant represents that the Dips have "No Artificial Preservatives."

17.     Defendant affixed a label to the containers in which it sells its Dips stating, "No Artificial Preservatives."

18.     Defendant then placed the Dips with the misleading labels into the stream of commerce, where it was purchased by Plaintiff and Class Members.

### Citric Acid is A Food Preservative

19.     Defendant states on the Dips' labels that the Dips contain no artificial preservatives. Thus, a reasonable consumer would believe the Dips contain no artificial preservatives

20.     In fact, the Dips contain citric acid, a well-documented and widely recognized food preservative.

21.    Citric acid's effects include the delaying spoilage from bacteria, mold, fungi, and yeast, delaying changes in color, flavor, texture, and delaying browning and rancidity over the shelf-life of a food or beverage product.

22.    The Food and Drug Administration ("FDA") defines a preservative at 21 C.F.R. § 101.22(a)(5):

> The term chemical preservative means any chemical that, when added to food, tends to prevent or retard deterioration thereof, but does not include common salt, sugars, vinegars, spices, oils extracted from spices, substances added to food by direct exposure thereof to wood smoke, or chemicals applied for their insecticidal or herbicidal properties.

23.    Citric acid does not fall into any of the regulatory exemptions from the FDA's definition of a preservative.

24.    As alleged in greater detail below, citric acid tends to prevent or retard the deterioration of food products, even when a manufacturer's subjective purpose for using citric acid is not for citric acid's preservative properties.

25.    The FDA expressly classifies citric acid as a preservative in its "Overview of Food Ingredients, Additives, and Colors" on the FDA's website[1]:

| Types of Ingredients | What They Do | Examples of Uses | Ingredient Names That May Be Found on Product Labels |
|---|---|---|---|
| Preservatives | Prevent food spoilage from bacteria, molds, fungi, or yeast (antimicrobials); slow or prevent changes in color, flavor, or texture and delay rancidity (antioxidants); maintain freshness | Fruit sauces and jellies, beverages, baked goods, cured meats, oils and margarines, cereals, dressings, snack foods, fruits and vegetables | Ascorbic acid, citric acid, sodium benzoate, calcium propionate, sodium erythorbate, sodium nitrite, calcium sorbate, potassium sorbate, BHA, BHT, EDTA, tocopherols (Vitamin E) |

---

[1] https://www.fda.gov/food/food-additives-and-gras-ingredients-information-consumers/types-food-ingredients.

26.     Citric acid's nature as a preservative is also acknowledge by insiders in the preservative manufacturing and distribution industries. One example is FBC Industries, Inc., a manufacturer and supplier of Food Chemical Codex[2] ("FCC") grade citric acid additives, acidulants, buffering agents and preservatives for the food and beverage industry, which describes citric acid's function: "Citric acid is the most commonly used acidulant[3] in the industry. As a food additive or food grade product, citric acid is used as a flavoring and preservative. The buffering properties of citrates are used to control pH and flavor."[4]

27.     More specifically, there are several ways in which citric acid functions as a preservative. citric acid is an antimicrobial. It kills microbes directly by penetrating the cell walls of the microorganisms.

28.     Citric acid also acts as a sequestrant, removing compounds and elements from their environment to slow the degradation of food and beverages.

29.     Citric acid also functions as an antioxidant by sequestering metal ions (chelation), which prevents food deterioration and retards microbial growth.

30.     While citric acid can also be used to impart taste, a greater quantity is required to impart taste than to preserve. The preservative effects of citric acid are present even at lower levels.

31.     So, Defendant's use of citric acid prevents (a) spoilage from bacteria, mold, fungi, and yeast; (b) changes in flavor, color, or texture; (c) browning; and (d) rancidity, over the shelf-life of the Dips.

---

[2] https://www.foodchemicalscodex.org.
[3] An acidulant is a food additive that imparts acidity and is used to adjust pH and act as a preservative.
[4] https://www.fbcindustries.com/citrates.

**Manufactured Citric Acid is An Artificial Ingredient**

32.     Defendant's representation that the Dips have "No *Artificial* Preservatives" is also false.

33.     The phrase citric acid dates to its original discovery in citrus fruits. But for consumer foods and beverages, citric acid is not derived from citrus fruit, but rather through an industrial-scale, manufacturing process.

34.     Generally, the process begins by growing the fungus *Aspergillus niger* in a sugar-rich solution like corn steep liquor. During the fermentation phase of the process, the mold metabolizes sugar, a byproduct of which is citric acid that the mold secretes into the solution. Environmental conditions like pH, temperature, and nutrient levels are carefully controlled to optimize citric acid production. The solution is then filtered to remove the mold. A citrate salt is precipitated out of the solution (usually as calcium citrate by adding a strong base like lime). The salt is in turn reconverted into citric acid by adding sulfuric acid. The flow chart below provides an overview of the process:



Citric acid production process flow chart

**Defendant Uses Artificial Citric Acid in Its Dips**

35.     On information and belief as described in the following paragraphs, Defendant uses artificial citric acid in its dips.

7

36.    Economic, practical and technical reasons dictate that the vast majority of food manufacturers like Defendant do not derive citric acid from citrus fruits but instead use the cheaper and more widely available fermentation-produced acid.

37.    Citrus fruits only contain 4-8% citric acid by weight in their juice. To produce one kilogram of citric acid would require hundreds of lemons. The high demand for citric acid far exceeds the available supply from citrus fruits.

38.    In 2024, the global citric acid market size was approximately 2.81 million tons. Annual production of lemons and limes worldwide reached a peak of approximately 26 million tons in 2024. Virtually none of that production was used for citric acid production because, for years, 99% of the world's citric acid has been produced via the fermentation process. As a result, global lemon/lime production would need to increase dramatically just to meet citric acid demand, assuming 100% of citrus were used for acid extraction. That assumption is unrealistic because of the many other essential uses (e.g., food, juice, essential oils) existing production levels currently supply.

39.    By contrast, fermentation-based production is significantly more cost-effective which is why it has for years supplied 99% of global citric acid. Seventy percent of that production is consumed by the food industry.

40.    The reasons fermentation is far more economical include: 1) microbial fermentation can be performed year-round anywhere in the world; 2) the input materials and chemicals for production are cheap; 3) production in bioreactors is not labor intensive; and 4) the relative operating costs are significantly lower.

41.    In addition, fermentation processes are comparatively easy to scale up in industrial bioreactors, allowing for consistent, year-round production regardless of seasonal variations.

Citrus extraction is limited by the seasonal and geographical availability of citrus fruits, making it less reliable for continuous large-scale production.

42.    As a result of the foregoing, essentially all citric acid used in the food industry is produced through fermentation process.

43.    Thus, strictly as a statistical matter, it is far more likely than not that Defendant uses manufactured citric acid in its Dips (and Defendant has not denied that it does so).

44.    There are additional reasons to believe Defendant uses manufactured citric acid, including the fact that Defendant does not tout its use of some "natural" form of citric acid. Also, Defendant does not charge an ultra-premium price for its Dips as would be likely if it used expensive forms of citric acid.

### Defendant's Misrepresentations Are Material to a Reasonable Consumer and Were Relied Upon by Plaintiff and the Class

45.    Plaintiff and reasonable consumers assume that food product labeling is true and accurate, and manufacturers, including Defendant, know that reasonable consumers rely upon those labels in making their purchasing decisions.

46.    Plaintiff and reasonable consumers rely on the truth and accuracy of Defendant's labels, including representations about the ingredients and contents when purchasing food products.

47.    Defendant's "No Artificial Preservatives" misrepresentation is material in that it concerns the type of information upon which a reasonable consumer would be expected to rely in deciding whether to purchase the Dips.

48.    Reasonable consumers, including Plaintiff, therefore pay more for the Dips labeled "No Artificial Preservatives" that they do not actually receive, and for which they would have paid less or not purchased at all had the truth been known.

49.     At all times, Defendant intended for consumers including the Plaintiff to rely on the label's representation that the Dips contain "No Artificial Preservatives." Otherwise, the "No Artificial Preservatives" representation serves no purpose.

50.     Plaintiff and reasonable consumers have been actually deceived by Defendant's misrepresentation.

## Defendant Intended to Mislead

51.     At all times, Defendant's misrepresentation was intentional. Defendant knew (a) what ingredients it was putting in the Dips; (b) that its own label misrepresented what ingredients were in the Dips; (c) that reasonable consumers would view, assume true, and rely upon information on the "No Artificial Preservatives" representation in making their purchasing decisions; (d) that the label misstated the true nature of the ingredients in the Dips; (e) that it was not giving the consumer the benefit of the bargain; and (f) that it was fraudulently charging consumers for Dips with citric acid while claiming no artificial preservatives were present.

52.     Defendant's misrepresentation constitutes unfair or deceptive acts or practices, including but not limited to the use or employment of a deception, fraud, false pretense, false promise, or misrepresentation within the meaning of the ICFA.

53.     As to the particulars of Defendant's fraudulent conduct, Defendant intentionally and knowingly misrepresented the ingredients in the Dips by falsely claiming that the Dips contain "No Artificial Preservatives," which it intended consumers to rely upon whenever they read the label and purchased the product.

54.     Empirical data has shown that labeling claims like the one at issue are often assigned a particular value by food manufacturers and/or third parties that provide such data for them. In other words, food manufacturers often know to the penny how much more money they can charge if they label their product, for instance, as containing no artificial preservatives. Plaintiff does not

yet have access to this data, but upon information and belief, Defendant has such data and relies upon it when choosing the statements it places on labels to entice sales and in setting its prices. This data will be revealed in discovery and will evidence the price premium damages alleged herein.

**Plaintiff and the Class Were Injured as The Result of Defendant's Deceptive Conduct**

55.    Plaintiff and the Class were injured when Defendant denied them the full benefit of their bargain. They paid money for Dips that were represented to them as being free of artificial preservatives, but Defendant delivered Dips that contained an artificial preservative, namely citric acid.

56.    Plaintiff and the Class suffered damages which include the purchase price of the product; or the difference between what Plaintiff and Class Members paid for the product and what the product was actually worth; or the price premium associated with the deceptive practice.

57.    Because the product was not as Defendant represented it to be, the product as sold was worth less than the product as represented, and Plaintiff and Class Members paid an excess amount for it. Had the truth been known, Plaintiff and Class Members would not have purchased the product at all or would have paid less for them.

58.    Defendant's misrepresentations violate the IFCA's prohibition of the act, use, or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact about the sale or advertisement of any merchandise in trade or commerce.

## CLASS ALLEGATIONS

59.    Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, Fed R. Civ. P. 23 *et. seq.,* on her own behalf and on behalf of the following proposed Class of all other similarly situated persons ("Class Members" of the "Class") defined as follows:

> All persons who purchased "la terra fina" brand Dips during the five-year period prior to the original filing of this lawsuit on January 25, 2024, through the date of preliminary approval (the "Class Period"). The Dips are: Artichoke & Jalapeño Dip & Spread, Cheesy Artichoke Dip & Spread, Chili Con Queso Dip, Everything But The Bagel Dip & Spread, Greek Yogurt Spinach & Parmesan Dip & Spread, Greek Yogurt Spinach Artichoke & Parmesan Dip & Spread, Green Chile & Cheese Dip & Spread, Mexicali Dip & Spread, Spinach Artichoke & Parmesan Dip & Spread and/or Sriracha Three Cheese Dip & Spread.

> Excluded from the Class are: (a) federal, state, and/or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; (b) Defendant, its officers, directors, or employee; any entity in which Defendant has a controlling interest or which has a controlling interest in Defendant; any affiliate, legal representative, heir, successor, or assign of Defendant or any person acting on its behalf; (c) all persons who are presently in bankruptcy proceedings or who obtained a bankruptcy discharge in the last three years; (d) any judicial officer in the lawsuit and/or persons within the third degree of consanguinity to such judge; and (e) any juror assigned to this action.

60.    Upon information and belief, the Class consists of thousands of purchasers. Accordingly, it would be impracticable to join all Class Members before the Court.

61.    There are numerous and substantial questions of law or fact common to all the members of the Class and which predominate over any individual issues, including:

   a.    whether the Dip labels are false, unfair, misleading, and deceptive;

   b.    whether Defendant violated state consumer statutes by selling the Dips with false, misleading, and deceptive representations;

   c.    whether Defendant's acts constitute unfair, deceptive or fraudulent business acts or practices;

    d.   whether Defendant breached express and/or implied warranties to Plaintiff and the Class Members;

    e.   whether Defendant intended that Plaintiff and the Class Members would rely on its representations;

    f.   whether Defendant's acts constitute deceptive, unfair, misleading or fraudulent business acts and practices;

    g.   whether Defendant was unjustly enriched; and

    h.   the proper measure of damages sustained by Plaintiff and Class Members.

62.    The claims of the Plaintiff are typical of the claims of Class Members, in that they share the above-referenced facts and legal claims or questions with Class Members, there is a sufficient relationship between the damage to Plaintiff and Defendant's conduct affecting the Class.

63.    Class Members and Plaintiff have no interests adverse to the interests other Class Members.

64.    Plaintiff will fairly and adequately protect the interests of Class Members and has retained competent and experienced counsel.

65.    A class action is superior to other methods for the fair and efficient adjudication of this controversy, since individual joinder of all Class Members is impracticable and no other group method of adjudication of all claims asserted herein is more efficient and manageable for at least the following reasons:

    a.   the claim presented in this case predominates over any questions of law or fact, if any exists at all, affecting any individual member of the Class;

    b.   absent a Class, the Class Members will continue to suffer damage and Defendant's unlawful conduct will continue without remedy while Defendant profits from and enjoys its ill-gotten gains;

    c.   given the size of individual Class Members' claims, few, if any, Class Members could afford to or would seek legal redress individually for the wrongs Defendant

committed against them, and absent Class Members have no substantial interest in individually controlling the prosecution of individual actions;

d.  when the liability of Defendant has been adjudicated, claims of all Class Members can be administered efficiently and/or determined uniformly by the Court; and

e.  this action presents no difficulty that would impede its management by the Court as a class action which is the best available means by which Plaintiff and members of the Class can seek redress for the harm caused to them by Defendant.

66.  Because Plaintiff seeks relief for all Class Members, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual member of the Class which would establish incompatible standards of conduct for Defendant.

67.  Further, bringing individual claims would overburden the Courts and be an inefficient method of resolving the dispute which is the center of this litigation. Adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interest of other members of the Class who are not parties to the adjudication and may impair or impede their ability to protect their interests. As a consequence, class treatment is a superior method for adjudication of the issues in this case.

**COUNT I**
**Violation of ICFA and All Other State Consumer Protection Statutes**
**(Deceptive Practices)**

68.  Plaintiff repeats and re-alleges the allegations of the preceding paragraphs 1-67 as if fully set forth herein.

69.  The ICFA declares the following to be unlawful:  "Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact…in the conduct of any trade or commerce[.]" 815 ILCS 505/2.

14

70.    The consumer protection statutes of other states and territories are similarly designed to prevent deceptive practices.

71.    Defendant engaged in a deceptive practice by misrepresenting that the Dips contain "No Artificial Preservatives," when the product actually contains manufactured citric acid. The product was therefore worth less than the product as represented, consumers paid a price premium which they would not have paid absent Defendant's misrepresentations, and consumers did not receive the benefit of their bargain.

72.    Defendant intended Plaintiff and reasonable consumers would rely on the deceptive practice because Defendant is aware that consumers like Plaintiff and Class Members expect products to be consistent with representations manufacturers like Defendant make on their packaging. Defendant intended to prey on these interests.

73.    Defendant's misrepresentation is material because it conveys false information that reasonable consumers would rely upon when considering whether or not to purchase the product.

74.    Defendant's deceptive practice occurred in the course of Defendant's trade or commerce because Defendant is in the business of manufacturing, distributing, and selling the Dips, and it does so throughout the United States.

75.    Defendant's deceptive practices proximately caused Plaintiff and consumers actual damages, because:

   a.    neither Plaintiff nor any reasonable consumer would expect to find citric acid in Dips labeled "No Artificial Preservatives,"

   b.    consumers purchase the product believing they will receive dips that contain "No Artificial Preservatives," but they do not actually receive dips without artificial flavors, colors or preservatives because of the presence of the citric acid; and

   c.    consumers therefore do not receive the benefit of the bargain.

76.    These damages include the purchase price of the product or the difference between
what Plaintiff and Class Members paid for the product and what the product was actually worth,
or the price premium associated with the deceptive practice. Because the product was not as
represented, the product as sold was worth less than the product as represented, and Plaintiff and
Class Members paid an excess amount for it. Had the truth been known, Plaintiff and Class
Members would not have purchased the product at all or would have paid less for them.

**COUNT II**
**Violation of ICFA and All Other State Consumer Protection Statutes**
**(Unfair Practices)**

77.    Plaintiff repeats and re-alleges the allegations of the preceding paragraphs 1-67 as if
fully set forth herein.

78.    The ICFA declares the following to be unlawful: "Unfair methods of competition
and unfair or deceptive acts or practices, including but not limited to the use or employment of any
deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression
or omission of any material fact, with intent that others rely upon the concealment, suppression or
omission of such material fact . . . in the conduct of any trade or commerce." 815 ILCS 505/2.

79.    The consumer protection statutes of other states and territories are similarly designed
to prevent unfair practices.

80.    Defendant engaged in unfair acts or practices by including the citric acid in the Dips
without including the phrase "with added ingredients" to modify the "No Artificial Preservatives"
claim on the Dips' label.

81.    Defendant intended that Plaintiff and reasonable consumers would rely on the unfair
acts or practices because Defendant did not disclose the presence of the citric acid on the front of
the label of the Dips. Rather, Defendant said the product has "No Artificial Preservatives,"
intending that consumers would rely on the accuracy of the front of the label. Defendant is aware

16

that consumers like Plaintiff and Class Members are interested in purchasing products without citric acid and that are consistent with representations made on their packaging. Defendant intended to prey on these interests.

82.    Defendant's unfair acts or practices occurred in the course of Defendant's trade or commerce because Defendant is in the business of manufacturing, distributing, and selling the Dips, and it does so throughout the United States, including throughout Illinois.

83.    Defendant's unfair acts or practices offend public policy by representing that the Dips contain "No Artificial Preservatives" without being accompanied by a phrase indicating that the Dips contain citric acid.

84.    Defendant's unfair acts and practices further offend Illinois public policy in that they also violate the Illinois Food, Drug, and Cosmetic Act, 410 ILCS 620/11, because the labels of the Dips are false and misleading as described herein.

85.    Defendant's unfair acts or practices are also immoral, unethical, oppressive, or unscrupulous because clandestinely adding citric acid to the Dips without adequately disclosing the fact that the Dips contain added ingredients does not comport with reasonable consumers' expectations to be told the truth about what they are buying and putting into their bodies, or into the bodies of their children. The policy requiring the Dips to be accompanied by the phrase "with added ingredients" is to protect consumers from Defendant's unfair acts or practices. Defendant's failure to disclose such is unethical and oppressive because they are trusted to follow the law and adequately disclose what is in its products.

86.    Defendant's unfair acts or practices leave the consumer with little alternative except to submit to it because consumers have no control over the representations Defendant puts on the Dips' label and packaging.

17

87.    Defendant's unfair acts or practices proximately caused Plaintiff and consumers actual damages, because:

   a.  neither Plaintiff nor any reasonable consumer would expect to find citric acid in dips labeled "No Artificial Preservatives;"

   b.  consumers purchase the product believing they will receive dips with "No Artificial Preservatives" but they do not actually receive dips with No Artificial Preservatives because of the presence of citric acid; and

   c.  consumers therefore do not receive the benefit of the bargain.

88.    These damages include the purchase price of the product or the difference between what Plaintiff and Class Members paid for the product and what the product was actually worth, or the price premium associated with the deceptive practice. Because the product was not as represented, the product as sold was worth less than the product as represented, and Plaintiff and Class Members paid an excess amount for it. Had the truth been known, consumers would not have purchased the product at all or would have paid less for them.

89.    These damages to Plaintiff and Class Members are substantial, are not outweighed by any countervailing benefits to Plaintiff and Class Members and are damages the Plaintiff and Class Members could not reasonably have avoided because they have no control over the representations Defendant puts on the Dips' label and packaging.

**COUNT III**
**Breach of Express Warranty**

90.    Plaintiff repeats and re-alleges the allegations of the preceding paragraphs 1-67 as if fully set forth herein.

91.    Defendant made the affirmation of fact and the promise to Plaintiff and the Class Members that the Dips had "No Artificial Preservatives," guaranteeing to Plaintiff and the Class Members that the Dips were in conformance with the representation.

92.    This affirmation of fact and promise became part of the basis of the bargain in which Plaintiff and Class Members purchased the Dips, and it was material to Plaintiff's and Class Members' purchasing decisions.

93.    Defendant breached its express warranty that the Dips contained "No Artificial Preservatives" by providing Plaintiff and Class Members with Dips containing citric acid.

94.    As a result of Defendant's breach of warranty, Plaintiff and the Class Members have been deprived of the benefit of their bargain in that they bought Dips that were not what they were represented to be, and they have spent money on Dips that had less value than was reflected in the premium purchase price they paid for the Dips.

95.    Because Defendant made the affirmation of fact and promise directly on its own labels and packaging, privity is not required to bring this claim.

96.    Because Defendant is the sole manufacturer and seller of the Dips, it has actual knowledge that the Dips are falsely labeled, and therefore pre-suit notice of this claim is not required.

97.    Nonetheless, Plaintiff provided pre-suit notice of a breach of warranty, having apprised the Defendant on February 13, 2023, in writing, of the problem with the Dips that she purchased.

98.    As a proximate result of Defendant's breach of express warranty, Plaintiff and Class Members suffered economic damages, including the full purchase price of the Dips or the premium paid for it.

**COUNT IV**
**Unjust Enrichment**

99.    Plaintiff repeats and re-alleges the allegations of the preceding paragraphs 1-67 as if fully set forth herein.

100.    Plaintiff and the Class Members conferred a benefit on Defendant in that they purchased the Dips that were manufactured, distributed, and sold by the Defendant.

101.    Defendant appreciated the benefit because, were consumers not to purchase the Dips, Defendant would have no sales and would make no money from the Dips.

102.    Defendant's acceptance and retention of the benefit is inequitable and unjust because the benefit was obtained by Defendant's misleading representations about the ingredients in the Dips.

103.    Equity cannot in good conscience permit Defendant to be economically enriched for such actions at Plaintiff's and Class Members' expense and in violation of Illinois law, and therefore, restitution and/or disgorgement of such economic enrichment is required.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff, individually and on behalf of all similarly situated persons, prays the Court:

    a.  grant certification of this case as a class action;

    b.  appoint Plaintiff as Class Representative and Plaintiff's counsel as Class Counsel;

    c.  award compensatory damages to Plaintiff and the proposed Class, or, alternatively, require Defendant to disgorge or pay restitution;

    d.  award statutory and punitive damages to Plaintiff and the proposed Class;

    e.  award pre- and post-judgment interest;

    f.  award reasonable and necessary attorneys' fees and costs to Class counsel; and

    g.  for all such other and further relief, as may be just and proper.

Respectfully submitted,

By: */s/  Matthew H. Armstrong*
　　Matthew H. Armstrong
　　matt@mattarmstronglaw.com
　　ARMSTRONG LAW FIRM LLC
　　8816 Manchester Rd. No. 109
　　St. Louis MO 63144
　　(314) 258-0212

　　Robert L. King
　　king@kinglaw.com
　　THE LAW OFFICE OF ROBERT L. KING
　　9506 Olive Blvd., Suite 224
　　St. Louis, MO  63132
　　(314) 246-0702

　　David C. Nelson
　　dnelson@nelsonlawpc.com
　　NELSON & NELSON, ATTORNEYS AT LAW, P.C.
　　420 North High Street, P.O. Box Y
　　Belleville IL 62220
　　(618) 277-4000

　　Stuart L. Cochran
　　Texas State Bar No. 24027936
　　scochran@condontobin.com
　　CONDON TOBIN SLADEK THORNTON NERENBERG PLLC
　　8080 Park Ln, Ste 700
　　Dallas, TX 75231
　　(214) 865-3804

　　*Attorneys for Plaintiff and the Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that on April 21, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which electronically delivered a copy of the same to all counsel of record.

*/s/ Matthew H. Armstrong*
Matthew H. Armstrong